IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| J.I.W., a minor, by and through T.W., his mother and next friend, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIV. ACT. NO. 1:20cv787-ECM (WO) |
| BLAKE DORMINEY, *et al.*, | ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION and ORDER**

Now pending before the Court are a motion to dismiss filed the City of Slocumb, Alabama ("the City")(doc. 8) and a motion to dismiss filed by Blake Dorminey ("Dorminey")(doc. 15).

On October 1, 2020, the Plaintiff, T.W., filed a complaint on behalf of her minor son, J.I.W., bringing Fourth and Fourteenth Amendment claims for "excessive use of force/unreasonable seizure" against Dorminey (count 1), state-law claims for assault and battery against Dorminey (count 2), and Fourth and Fourteenth Amendment claims against the City (count 3). (Doc. 1).

The Defendants have moved to dismiss all of the claims against them in this case.

For the reasons that follow, the City's motion to dismiss is due to be GRANTED and Dorminey's motion to dismiss is due to be GRANTED in part and DENIED in part.

## I.    STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U. S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U. S. 544, 570 (2007)).

"Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 663 (alteration in original) (citation omitted). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678.  Conclusory allegations that are merely "conceivable" and fail to rise "above the speculative level" are insufficient to meet the plausibility standard.  *Twombly*, 550 U. S. at 555, 570.  This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678.  Indeed, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.*

## II.    FACTS

The facts as alleged in, and as incorporated into,[1] the complaint are as follows:

---

[1] In moving to dismiss, the Defendants have relied extensively on unsworn witness statements and a video recording of the incident.  The Defendants point out that the complaint refers to the witness statements and even quotes from some of them. A motion to dismiss is usually decided based on the complaint itself, but an exception may apply when a plaintiff refers to a document in its complaint and the defendant attaches the document to its motion to dismiss.  *See Fin. Sec. Assur., Inc. v. Stephens, Inc*., 500 F.3d 1276, 1284

J.I.W. was a thirteen-year-old middle school student at the time of the incident at issue in this case.  He had been diagnosed with bipolar disorder, obsessive compulsive disorder, oppositional defiant disorder, separation anxiety disorder, conduct disorder, attention deficient hyperactivity disorder, and major depression. (Doc. 1 ¶16).

Dorminey is a law enforcement employee of the City.  The complaint alleges that the Alabama Department of Education's 2018 *Positive Behavior Interventions and Support* is a guidebook which encourages law enforcement agencies to train school resource officers in the best practices of the National Association of School Resource Officers (NASRO) and the Alabama Association of School Resource Officers (TAASRO). (*Id.* ¶¶32, 33).  The complaint alleges that Dorminey was not trained as a school resource officer in the best practices promulgated by the NASRO or TAASRO. (*Id.* ¶44).

On October 1, 2018, J.I.W. became agitated in class while at Slocumb Middle School, and was instructed to leave his classroom and go into the hallway outside of the classroom.  The complaint alleges that while he was in the hallway, J.I.W. yelled and refused to report to the principal's office as directed.  J.I.W. became agitated and punched a metal locker.  (*Id.* ¶59).

In an unsworn statement, a school principal, B.T. Hinson ("Hinson"), describes J.I.W. as walking toward him aggressively. (Doc. 16-5).  Dorminey had been called to the scene and stopped J.I.W.

---

(11th Cir. 2007) (stating that because the document was attached to the motion to dismiss, there was notice that the district court might consider the document and because it is referred to in the complaint, it is central to claim, its consideration comports with the requirements of notice pleading, and neither party challenges its authenticity).  Accordingly, the Court has considered the facts alleged in the complaint and witness statements and the video referred to in the complaint and attached to the motions to dismiss.

The complaint alleges that without provocation from J.I.W., Dorminey harshly twisted J.I.W.'s wrist and wrenched his left arm behind his back. (*Id.* ¶79). Dorminey is alleged to have twisted J.I.W.'s wrist and wrenched his left arm behind his back a total of three times. (*Id.* ¶80). The third time that Dorminey wrenched the arm, he also is alleged to have brought J.I.W. to the floor. (*Id.* ¶81). The complaint alleges that Dorminey's "post-incident report states that he 'heard J.I.W.'s arm pop' as he slammed J.I.W. to the ground." (*Id.* ¶82). The complaint further alleges that while J.I.W. was on the floor, Dorminey continued to pull J.I.W.'s arm behind his back and placed J.I.W.'s left arm in handcuffs. (*Id.* at 82). According to the allegations of the complaint, when J.I.W. hit the ground he began to writhe and scream that his arm was hurt and he was in pain. (*Id.* ¶83). Despite the cries of pain, Dorminey continued to exert pressure on the left arm, pulled the right arm back, and cuffed both of J.I.W.'s hands. (*Id.* ¶84). Then, according to the allegations of the complaint, Dorminey dragged J.I.W. across the floor while he was handcuffed. (*Id.* ¶86). J.I.W. ultimately required two surgeries to repair his broken arm. (*Id.* ¶92).

Witnesses to the incident gave unsworn, written statements which are referred to in the complaint and which the Defendants have provided. Kari Whitaker's description includes that J.I.W. "bowed up at Mr. Hinson acting like he was going to hit him," and that Dorminey tried to take J.I.W. by the arm, but J.I.W. was "trying to fight him." (Doc. 16-2). Brad George also describes J.I.W. as "bowed" up at Hinson and says that J.I.W. tried to "hip check" or "toss the officer off his feet." (Doc. 16-3). He states that the officer took J.I.W to the ground and handcuffed him. (*Id*). Staci Wilkerson states that J.I.W. "starts yelling at Mr. Hinson, punched the locker and comes at him." (Doc. 16-4). She also

4

describes J.I.W. as "fighting with the officer." (*Id.*).  Staci Wilkerson further states that while J.I.W. was on the ground, he yelled that he was in pain. (*Id.*).  Zeb Brown describes J.I.W. as having clinched fists and lunging in the direction of Hinson. (Doc. 16-5). Michelle Hendrix's statement describes J.I.W. as punching the locker after Hinson talked to him and "tussling with" Dorminey. (Doc. 16-1).

There is a video recording of the incident that does not contain audio.  The complaint alleges that the video confirms that J.I.W. was not armed and does not attempt to hit Dorminey or escape. (Doc. 1 ¶¶76, 78).  The complaint also alleges that the video reveals that during the encounter between Dorminey and J.I.W., Hinson was standing six feet away, on his phone, and displaying no fear of J.I.W.  (*Id.*  ¶74).

In 2019, J.I.W. brought a special-education, due process claim against the Geneva County Board of Education, which was settled. As part of the settlement, J.I.W. reserved all claims against the City and Dorminey.

### III.   DISCUSSION

Before the Court turns to the grounds asserted for dismissal of T.W.'s federal and state-law claims, the Court first addresses the claims conceded by T.W.

#### A.  Claims No Longer at Issue

In response to the motions to dismiss, T.W. concedes that her official-capacity claim against Dorminey and her claim against the City for punitive damages are due to be dismissed. (Doc. 25 at 4).  The Defendants contend that in addition to the claims expressly conceded, by conceding the official-capacity clams against Dorminey, T.W. has impliedly conceded any state-law claim against the City.  Upon review of the complaint as pleaded,

the Court finds that the state-law claims have been alleged against Dorminey only, and there is no alleged basis for liability of the City for any violation of state-law. (Doc. 1 at 21). Therefore, the Court agrees that there are no state-law claims against the City at issue in the case.

The Defendants also argue that T.W. has conceded her Fourteenth Amendment claim because she has not responded to arguments regarding that claim. Specifically, Dorminey has moved to dismiss a Fourteenth Amendment claim that he imposed corporal punishment in a way that shocks the conscience, arguing that such a claim is due to be dismissed because he did not impose corporal punishment. While T.W. has alleged in the complaint that Dorminey engaged in conscience-shocking behavior, the brief in opposition to the motions to dismiss only references a "sole claim" under 42 U.S.C. § 1983, and does not elaborate on any separate theory of liability asserted pursuant to the Fourteenth Amendment. (Doc. 25 at 7). The Court concludes, therefore, that either the reference in the complaint to the Fourteenth Amendment is a reference to incorporation of the Fourth Amendment to the states through the Fourteenth Amendment, or that T.W. has chosen not to pursue a separate Fourteenth Amendment claim. The motions to dismiss, therefore, are due to be GRANTED to the extent that a separate Fourteenth Amendment claim was originally pleaded against Dorminey and the City.

**B. Claims Against Dorminey**

*1. Federal Claim for Violation of the Fourth Amendment*

Dorminey argues that the federal claim against him is due to be dismissed on the basis of qualified immunity because the complaint does not plead factual allegations that

plausibly demonstrate a violation of clearly established law.  T.W. argues in response that Dorminey violated J.I.W.'s clearly established Fourth Amendment rights to be free from unlawful seizure and excessive force.

Qualified immunity protects government officials from suit if they are "performing discretionary functions" and "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In examining the discretionary authority issue, courts ask whether the government employee was (a) performing a legitimate job-related function, (b) through means that were within his power to utilize. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).  T.W. appears to concede that Dorminey was acting within his discretionary authority during the events in question.

Determining whether a defendant acting within his discretionary authority is entitled to qualified immunity requires a two-pronged inquiry.  The first prong is whether the facts, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right [.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The second prong of the qualified-immunity analysis asks whether the violation of the federal right was "clearly established" at the time of the violation. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

a.  Constitutional Violation

Courts apply the reasonableness standard articulated in *New Jersey v. T.L.O.*, 469 U.S. 325, 341–42 (1985), to seizures by law enforcement officers within the school context.

*See Gray ex rel. Alexander v. Bostic,* 458 F.3d 1295, 1304–06 (11th Cir. 2006).  Under that standard, reasonableness is evaluated using a two-step inquiry: "first, one must consider whether the  . . . action was justified at its inception; second, one must determine whether the search as actually conducted was reasonably related in scope to the circumstances which justified interference in the first place." *Gray,* 458 F.3d at 1304 (citations omitted).

i. Whether the action was justified at its inception

In applying the first *T.L.O.* prong of analysis, this Court is guided by the Eleventh Circuit's analysis in *Gray*.  In *Gray*, a student threatened a coach while at school, and a sheriff's deputy who served as the school's security officer pulled the student's hands behind her back and placed her in handcuffs. 458 F.3d at 1301.  The student's claim was that the deputy used excessive force because he lacked a right to detain the student at all. *Id.* at 1304. The Eleventh Circuit explained that the excessive force claim was not an independent claim but was subsumed in her seizure claim.  *Id.*  The court held that the officer had a reasonable basis for stopping the student and asking her questions because he witnessed her threaten to do something physically to her teacher. *Id.* at 1305.  The court then considered whether the subsequent handcuffing of the student was reasonably related to the scope of the circumstances which justified the interference in the first place. *Id.*  The court held that there was a constitutional violation because there was no evidence that the student was gesturing or engaging in any further disruptive behavior; instead, the officer handcuffed the student as punishment. *Id.* The court held that "the handcuffing was excessively intrusive given [the student's] young age and the fact that it was not done to protect anyone's safety." *Id.*   The court further held that the deputy's conduct in

8

handcuffing the student, "a compliant, nine-year-old girl for the sole purpose of punishing her was an obvious violation of [her] Fourth Amendment rights." *Id.* at 1307.

In this case, T.W. concedes that when J.I.W. entered the hallway, he was agitated and angry and punched a metal locker. (Doc. 25 at 21).  T.W. focuses on the time period after that, however, and argues that not all of the witnesses' statements mention aggression toward Hinson.

Upon review of the witnesses' unsworn statements, which are incorporated by reference into the complaint, it appears that only witness Michelle Hendrix does not expressly mention aggression by J.I.W. toward Hinson.  Michelle Hendrix does not, however, deny that J.I.W. was acting aggressively toward Hinson, but, in fact, states that J.I.W. punched the locker after Hinson began speaking to him. (Doc. 16-1).  Although T.W. appears to argue in brief that Hinson also does not mention aggression toward him, in his statement, Hinson states that J.I.W. was walking toward him aggressively. (Doc. 16-5). Witnesses Kari Whitaker, Brad George, and Staci Wilkerson describe J.I.W. as "bowed up" or "coming at" Hinson, and/or acting as though he wanted to hit Hinson. (Doc. 16-2, 16-3, & 16-4).

"[U]nder *T.L.O.*, the level of suspicion in a school setting needed to justify a search or an investigatory stop is only reasonableness under the circumstances." *Gray,* 458 F.3d at 1304.  Applying the holding of *Gray* to the facts alleged regarding J.I.W.'s aggression toward Hinson, it appears to the Court that Dorminey's actions were justified at the inception when he first detained J.I.W.  *See id.* (holding that stopping to question a student who threatened to physically harm a teacher was reasonable).

9

ii.  Scope of the seizure/excessive force

The application of the second *T.L.O.* analytical prong—the reasonableness of scope of the detention—to the facts alleged in this case is not as straightforward. *See Gray*, 458 F.3d at 1305.  The analysis in *Gray* does not clearly apply because J.I.W. alleges that the manner of handcuffing him was unconstitutional, whereas in *Gray* excessiveness was found because there no need for handcuffs at all. *Id.* at 1304 & n.6 ("Although Gray alleges that Deputy Bostic tightened the handcuffs enough to cause her pain, she has not argued that the handcuffing constituted excessive force even if Deputy Bostic's stop was supported by reasonable suspicion.").  In *Gray*, the excessive force claim was subsumed within the unlawful detention claim. 458 F.3d at 1304; *see also Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000) (when a seizure is unlawful, claims that the amount of force used during the seizure was excessive are generally subsumed in the search-and-seizure analysis because any amount of force is excessive when there is no legal basis for a stop).  Because *Gray* does not control the analysis of T.W.'s claim based on the manner in which Dorminey detained J.I.W., it appears to the Court that T.W.'s claim is better analyzed under precedent regarding lawful use of force.  *See M.D. ex rel. Daniels v. Smith*, 504 F. Supp. 2d 1238, 1248 (M.D. Ala. 2007) (applying excessive force analysis where a stop of a student was reasonable), *aff'd*, 278 F. App'x 987 (11th Cir. 2008).

In evaluating the use of force, the factors to consider include (1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and, (4) whether the force was applied in good faith or maliciously and sadistically. *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008).

Courts additionally consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).[2]

> a. Analytical factors of the need for the application of force, the relationship between the need and the amount of force used, and the extent of the injury inflicted

Relevant to the analytical factor of the need for the application of force, the complaint alleges that none of the witnesses reported that J.I.W. threatened Dorminey with physical harm, that he possessed a weapon, or threatened to use a weapon. (Doc. 1 ¶¶ 62, 63). T.W. argues, therefore, that the alleged facts support that at no time when Dorminey wrenched J.I.W.'s arm or when J.I.W. was on the floor did J.I.W. pose a threat to the safety of the officer or others. In her brief, T.W. also argues that the video shows that J.I.W. gestured, but that the video confirms that J.I.W. did not attempt to hit or resist Dorminey. It is T.W.'s contention that Dorminey harshly twisted J.I.W.'s arm without provocation. T.W. also points out that during the video recording of the encounter with Dorminey, Hinson is shown standing only feet away from J.I.W., on his phone, and displaying no outward signs of fear for his safety. (Doc. 1 ¶74).

Although T.W. has argued that J.I.W. was not resisting Dorminey, witness statements that T.I.W. was "fighting" and "tussling" with Dorminey, and the video,

---

[2] Although the Defendants argue that J.I.W.'s status as a child does not enter into the analysis, citing non-binding authorities (Doc. 16 at 45), the scope of detention requires a consideration of whether "the measures adopted are reasonably related to the objectives of the [seizure] and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Gray*, 458 F.3d at 1305.

incorporated into the complaint, are inconsistent with that contention. (Doc. 16-2).  These sources, incorporated into the complaint, reveal that J.I.W. was not responsive to Dorminey's commands.  As the Defendants point out, handcuffing, by itself, has been determined to be a reasonable use of force. *See Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003).  Dorminey's initial actions, therefore, were not unjustified under the facts as alleged.

Although some use of force may have been reasonable given the initial resistance to Dorminey, the factors of the relationship between the need and the amount of force used and the extent of the injury inflicted, *Hadley* 526 F.3d at 1329, weigh in favor of a finding of a constitutional violation under the facts as alleged.  The complaint alleges that the third time that Dorminey wrenched J.I.W.'s arm, Dorminey "heard J.I.W.'s arm pop." (*Id.* ¶82)(quotation omitted).  The complaint also alleges that once J.I.W. was on the floor, Dorminey continued to pull J.I.W.'s arm behind his back and place J.I.W. in handcuffs. (*Id.* at 82).  The complaint further alleges that when J.I.W. hit the ground he began to writhe and scream that he was in pain. (*Id.* ¶83).  Despite the cries of pain, Dorminey continued to exert pressure on the arm, pulled the right arm back, and cuffed both of J.I.W.'s hands. (*Id.* ¶84).  Dorminey then dragged J.I.W. across the floor while he was handcuffed. (*Id.* ¶86).  J.I.W. required two surgeries to repair his broken arm. (*Id.* ¶92).

The Defendants rely on other decisions applying excessive force analysis to argue that the amount of force used by Dorminey was reasonable even though J.I.W.'s arm was broken.  They point out that handcuffing is often considered to be a *de minimus* use of force; however, the facts alleged here go beyond mere handcuffing. *See Patel v. City of*

12

*Madison, Alabama*, 959 F.3d 1330, 1342 (11th Cir. 2020)(finding a constitutional violation even though a detention method that is usually considered *de minimus* force was used, because of the manner in which the technique was executed in that case).  They also cite cases for the proposition that handcuffing has been found to be reasonable even when an injury is involved. *See Rodriquez v. Farrell*, 280 F.3d 1341, 1352 (11th Cir. 2002)(holding that the force used was reasonable where handcuffs were applied, even though the plaintiff later had multiple surgeries and ultimately had to have his arm amputated, because there was no evidence that the officer knew that handcuffing would aggravate a preexisting injury); *see also Baker v. Clements*, 760 F. App'x 954 (11th Cir. 2019) (holding that an officer acted reasonably in using force where the plaintiff only had one hand cuffed and refused to present his right arm because, even though the plaintiff later explained that he was unable to move his right arm due to a preexisting injury, a reasonable officer would not have known of that preexisting injury).

In this case, factual development is needed.  While it is alleged that J.I.W.'s arm was broken so severely that two surgeries were required to repair it, there are no facts before the Court to allege what specifically caused the break, or to show what, if any, role placing the handcuffs on J.I.W. after Dorminey heard a "pop" played in J.I.W.'s injury. *Cf. Sebastian v. Ortiz*, 918 F.3d 1301, 1309 (11th Cir. 2019)(positing that if an officer needlessly handcuffed an injured driver who crashed his vehicle while speeding and seriously aggravated the injuries caused by the accident, the fact that the officer harmed the driver by 'merely' applying handcuffs would not necessarily bar an excessive force claim.").  Accepting the facts as alleged, including the witness statements and video

incorporated by reference, the facts are that Dorminey wrenched J.I.W.'s arm with enough force that he heard a "pop," and that during the placement of the handcuffs, Dorminey was aware of J.I.W.'s "obvious injury and cries of pain." (Doc. 1 ¶84).  Dorminey's knowledge of the injury and J.I.W.'s pain distinguishes these facts from the *Rodriquez* and *Baker* cases cited by the Defendants.  Therefore, while initially the use of some force may have been reasonable to detain J.I.W., the severity of the injury and the amount of force used in wrenching J.I.W.'s arm, resulting in an audible "pop," and in continuing pressure on the arm despite cries of pain, are factors which weigh in favor of a finding of a plausible allegation of an unreasonable use of force.

b. Analytical factor of the severity of the crime at issue

Regarding the factor of the severity of the crime at issue, Dorminey has argued that he had reasonable suspicion to believe J.I.W. committed disorderly conduct, obstructing governmental operations, harassment, and attempted assault second degree.  According to the allegations of the complaint, J.I.W. had displayed aggression toward Hinson, which may have supported reasonable suspicion that one or more of those crimes had been committed.[3]  However, "under the first *Graham* factor—the severity of the crime at issue— [a court] must assess the reasonableness of an officer's use of force by examining the circumstances at the time of the officer's actions, not the time of his initial encounter with the suspect."  *Spencer v. City of Orlando, Fla*., 725 F. App'x 928, 931 (11th Cir. 2018). Under the facts as alleged, J.I.W. was subjected to force when his arm was wrenched a

---

[3]  Weighing against that conclusion are the allegations that J.I.W. was never punished by the school or charged with any crimes. (Doc. 1 ¶¶95, 96).

third time and when he was on the ground squirming in pain.  The crimes identified were not being committed at those points, because according to the allegations of the complaint, J.I.W. was not acting aggressively toward Hinson or resisting Dorminey when those aspects of force were used.  Therefore, the Court concludes that this factor weighs in favor of a finding of a plausible allegation of unreasonableness in the use of force.

> c. Analytical factors of whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight

With respect to the *Graham* factors of whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight, the Defendants contend that the video reveals that J.I.W. tried to take Dorminey to the ground with a hip check and that when the two landed on the floor, J.I.W. kicked and squirmed vigorously and refused to present his right arm for handcuffing. (Doc. 28 at 26).  The complaint, however, alleges that J.I.W. was writhing and crying out in pain before the handcuffs were fully applied, which is not contradicted by the video or any witness statements.  The video also reveals that there were other adults at the scene and that Hinson was standing near J.I.W. without displaying fear.  The complaint further alleges that J.I.W. was unarmed and did not threaten the officer with harm.

While allegations incorporated from witness statements that J.I.W. initially resisted Dorminey's attempts to detain him weigh against J.I.W., allegations that J.I.W. did not threaten the officer with harm or strike the officer and, once on the ground, J.I.W. was

writhing in pain and not striking the officer, weigh in favor of a finding of an unreasonable use of force. *See Cantu v. City of Dothan, Alabama*, 974 F.3d 1217, 1230 (11th Cir. 2020) (in evaluating resistance to arrest in a case of deadly force, noting that the resistance was non-violent in that the arrestee never threw any punches, never kicked any of the officers, and never physically or verbally threatened to harm them).

> d.  Analytical factor of whether the force was applied in good faith or maliciously and sadistically

The court is to consider whether the force was applied in good faith or maliciously and sadistically. *Hadley*, 526 F.3d at 1329.  At least one witness said that Dorminey was "calm" in the encounter with J.I.W., (doc. 16-3), but it also is alleged that after J.I.W. was crying out in pain, the second handcuff was applied, and then J.I.W. was dragged across the floor. Without further factual development, the Court cannot conclude that this factor weighs strongly at this point in this case.  *Cf. Ruda v. Boisvert*, 2020 WL 6044556, at *13 (M.D. Ala. Oct. 13, 2020)(noting that it is difficult to make out on the dashcam video whether the plaintiff was refusing to surrender his hands or whether the officers' blows and tasing were inflicted "maliciously and sadistically" on an unresisting suspect).

In conclusion, applying all of the relevant analytical factors to the alleged facts, the Court concludes the complaint has stated a plausible claim of excessive force.  *See Williams v. Morgan*, 652 F. App'x 365, 373 (6th Cir. 2016) (holding that there was a constitutional violation where an officer detained a student using a control tactic considered to be low level force, which resulted in a broken arm, the crime of the 13-year-old girl was minor, she was not arrested, and the officer "aggressively pursued, seized, and manipulated her to

the point that he broke her arm . . . [and] then maintained this physical restraint and pressure on her broken arm, despite her pleas for relief, all the while threatening or menacing her verbally.").

        b.  Clearly Established Law

A plaintiff may establish that the law clearly established that a particular amount of force was excessive in one of three ways:  (1) a plaintiff may point to a materially similar case; (2) a plaintiff can show that a broader, clearly established principle should control the novel facts, or (3) a plaintiff may rely on the "obvious clarity" path, which applies when "the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw." *Patel*, 959 F.3d at 1343 (citing *Priester v. City of Riviera Beach, Fla*., 208 F.3d 919, 926 (11th Cir. 2000)).

The Defendants argue in their jointly filed reply brief that T.W. has failed to cite any controlling use-of-force precedent because T.W. relies on *Gray*, which is not a use-of-force case. (Doc. 28 at 19).  In opposition to the motions to dismiss, however, in addition to *Gray,* T.W. cites the Court to *Patel*, 959 F.3d at 1343, an excessive force case. (Doc. 25 at 20-21).  The *Patel* case stands for the proposition that the use of gratuitous force on a suspect who is not resisting arrest presents "obvious-clarity facts" that render "particularized preexisting case law" irrelevant. 959 F.3d at 1343 (citing *Stephens v.*

*DeGiovanni*, 852 F.3d 1298, 1328 (11th Cir. 2017)).[4]  T.W.'s position is that J.I.W. was not resisting arrest at the time force was used.

In *Smith v. Mattox*, 127 F.3d 1416, 1419–20 (11th Cir. 1997), the court explained that in a case where it was reasonable for an officer to think that he was entitled to use some force to put a suspect into a cuffing posture, if the suspect offered "no resistance at all," considerable effort and force resulting in a broken arm was "obviously unnecessary to restrain even a previously fractious arrestee."  The court held that the unlawfulness of the conduct was readily apparent even without clarifying caselaw. *Id.* at 1420.

As discussed above, although Dorminey takes the position that J.I.W. was resisting arrest and would not present his arm for cuffing as he lay on the floor, the video does not contradict the allegation that J.I.W. was writhing and crying out in pain before the handcuffs were fully applied.  Here, similar to the situation in *Smith*, T.I.W. had initially resisted arrest, but then sufficient force was used to severely break his arm, and he was writhing and crying out in pain, not resisting arrest, when additional force was used to complete the cuffing.  Accordingly, this Court concludes that qualified immunity should be denied, although it appropriately can be raised at a later point in the proceedings upon further factual development. *Cf. J.S. v. Campbell*, 2006 WL 2864254, at *6 (M.D. Ala. 2006)(denying qualified immunity where a plaintiff resisted the defendant's attempts to detain him, but did not strike defendant or pose a threat to Defendant and was placed in a

_____

[4] Although the *Patel* case relied on by T.W. was decided after the incident at issue, "obvious clarity" precedent relied on in that opinion had been decided at the time of the incident at issue. 959 F.3d at 1343.

choke hold while restrained in the handcuffs). Consequently, the motion to dismiss is due to be DENIED as to the Fourth Amendment claim against Dorminey.

    *2.   State-law claims*

In Alabama, " '[a]ssault' has been defined as 'an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.'" *Wood v. Cowart Enterprises, Inc*., 809 So. 2d 835, 837 (Ala. Civ. App. 2001). The elements of battery are (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner. *Ex parte Atmore Cmty. Hosp*., 719 So.2d 1190 (Ala. 1998).

Dorminey argues that the state-law claim against him is due to be dismissed because he is entitled to state-agent immunity. T.W. responds that under Alabama law, Dorminey applied more force than was warranted by the circumstances, and is therefore not entitled to state-agent immunity.

The Alabama legislature has granted statutory immunity from tort liability to municipal police officers for "conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." ALA. CODE § 6-5-338(a). Such immunity shields a state agent from suit in his or her personal capacity for claims based upon "exercising judgment in the enforcement of the criminal laws of this State . . . ." *Ex parte Cranman*, 792 So.2d 392, 405 (Ala. 2000). No immunity is available, however,

"when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Id.*

The Eleventh Circuit has held that Alabama's state-agent immunity does not apply where an officer used gratuitous force in violation of the Fourth Amendment. *See, e.g., Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 742 (11th Cir. 2010). An officer's use of gratuitous force when a plaintiff is not resisting arrest supports an inference that the officer's conduct was willful. *See Patel v. City of Madison, Alabama*, 959 F.3d 1330, 1344 (11th Cir. 2020). Based on the reasoning set out above in the denial of qualified immunity on the Fourth Amendment claim, the Court also concludes that the motion to dismiss is due to be DENIED as to the state-law claim against Dorminey.

### C. Federal Claim Against the City

To impose municipal liability under § 1983,[5] a plaintiff must allege facts showing that (1) constitutional rights were violated, (2) the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) the policy or custom caused the violation. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). A plaintiff can allege a policy or custom by one of two ways: by showing that the alleged constitutional injury was caused by "a municipal official who has final policymaking authority in a certain area of the city's business," or (2) by establishing "a widespread practice that, although not authorized by written law or express municipal policy, is so

---

[5] As earlier noted, T.W.'s brief does not elaborate on any Fourteenth Amendment theory, so the Court has considered the federal claim to be a Fourth Amendment claim asserted against a state actor by way of the Fourteenth Amendment.

permanent and well settled as to constitute a custom or use with the force of law." *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1480-81 (11th Cir. 1991).

T.W. argues that she has established municipal liability for a constitutional violation based on the City's stated policy of not complying with the Alabama Department of Education's guidelines regarding school resource officers and/or its custom or practice of failing to adequately train its officers. (Doc. 25 at 17). The City argues in response that its alleged failure to comply with the Alabama Department of Education's non-binding guidelines regarding school resource officers is not a constitutional violation, and that T.W. has not shown a municipal policy or custom that amounts to deliberate indifference to a constitutional right because there has been no showing of previous violations of law. The Court will address the official policy argument first.

T.W. argues that between 2002 and October of 2018, the City did not employ officers who had the Alabama Department of Education's school resource officer training, and that the City disregarded directives of the Alabama Department of Education. The complaint alleges that Dorminey was not trained as a school resource officer in the best practices promulgated by the NASRO or TAASRO. (Doc. 1 ¶44). T.W. contends that placing Dorminey in a school as a school resource officer without that training violated Alabama Department of Education's requirements.

In support of the position that the violation of Alabama Department of Education directives and guidelines can establish municipal liability, T.W. cites the Court to *Haley v. City of Boston*, 657 F.3d 39, 51 (1st Cir. 2011), in which the First Circuit found a sufficient allegation of municipal liability where the plaintiff "alleged both that the [defendant] had

a standing policy that was itself unconstitutional and that the City failed to train its personnel in their evidence-disclosure obligations despite notice of persistent and ongoing violations."

The allegations in this case are not like those in *Haley* case cited by T.W. because T.W. has not alleged that the City has a policy unconstitutional on its face, but rather has alleged that the City's policy was a failure to follow the guidelines of the Alabama Department of Education.  Even if this Court assumed that the Alabama Department of Education's guidelines were somehow binding on the City, which has not been alleged by T.W., even "[f]ailure to comply with a state regulation is not itself a constitutional violation." *Barber v. City of Salem, Ohio*, 953 F.2d 232, 240 (6th Cir. 1992).  A failure to comply with regulations also "does not establish the requisite actual notice and deliberate indifference."  *Gebser v. Lago Vista Indep. Sch. Dist*., 524 U.S. 274, 291–92 (1998)(examining an alleged failure of a school system to comply with Department of Education regulations).  In the Eleventh Circuit, if a city's policy is not "facially unconstitutional," a plaintiff has to show that the city "was deliberately indifferent to the known or obvious consequences of its policies."  *Am. Fed'n of Labor & Cong. of Indus. Organizations v. City of Miami, FL*, 637 F.3d 1178, 1188 (11th Cir. 2011) (examining a Mutual Aid Agreement and Security Plan as a policy alleged to have caused a constitutional violation).  Therefore, the allegation, without more, that the City had a policy of not following Alabama Department of Education guidance is not sufficient to establish a municipal policy for purposes of §1983 municipal liability.

T.W.'s other alleged basis for liability on the part of the City is an alleged failure to train.   A municipality can be held liable under §1983 when its employees cause a constitutional injury as a result of the municipality's failure to adequately train its employees. *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir.1998).  It is not enough to show that the training was inadequate, however. *Id.*  The City must be on notice that the training was inadequate. *Id.* A plaintiff may demonstrate notice by showing a "widespread pattern of prior abuse" or even a single earlier constitutional violation. *Am. Fed'n of Labor & Cong. of Indus. Organizations v. City of Miami, FL*, 637 F.3d 1178, 1189 (11th Cir. 2011).

Here, T.W. has not attempted to allege a widespread pattern of abuse.  In addition, the avenue of a single constitutional violation as a basis for municipal liability is not available to T.W.  Although the Supreme Court has "hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations," the Eleventh Circuit has concluded that the "failure to provide specific training regarding the detention of students, in addition to general training regarding use of force during detention and arrest, was not 'so likely' to result in the violation of students' Fourth Amendment rights" to demonstrate deliberate indifference to the need for training without prior notice.  *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1308–09 (11th Cir. 2006). Therefore, by failing to allege a widespread pattern of abuse, T.W. has failed to plead facts which could establish a basis of municipal liability on the basis of a failure to train.

The Court concludes, therefore, that the complaint does not plausibly allege a basis for municipal liability and that the City's motion to dismiss is due to be GRANTED.

## IV.   CONCLUSION

For the reasons discussed, it is ORDERED as follows:

1. The motion to dismiss filed the City of Slocumb (doc. 8) is GRANTED and the City of Slocumb is dismissed as a party in this case.

2. The motion to dismiss filed by Blake Dorminey (doc. 15) is DENIED as to the Plaintiff's Fourth Amendment claim and state-law assault and battery claims against Blake Dorminey in his individual capacity and is GRANTED in all other respects.

Done this 11th day of June, 2021.

/s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE